H. L. BROOKS, et al., individually and in behalf of others similarly situated, v. GEORGE S. PATTERSON, as Mayor, EUGENE F. BENNETT, et al., each as Councilman of the City of St. Petersburg, Florida, and WILLIAM S. HOWELL, et al., as and constituting the Aviation Board of the City of St. Petersburg, Florida, and C. F. SHARPE, as City Manager of the City of St. Petersburg, Florida.

31 So. (2nd) 472            June Term, 1947
July 8, 1947             Special Division A
Rehearing denied July 30, 1947

*Clair A. Davis,* for appellants.

*Carroll R. Runyon, Harry I. Young, Lewis T. Wray, Frank D. McDevitt* and *Bussey, Mann, Simmons & Fielding,* for appellees.

BUFORD, J.:

The appeal brings for review final decree entered by the Chancellor in a suit wherein the bill of complaint and the amended bill of complaint prayed that the defendants:

"Be perpetually enjoined and restrained from suffering or permitting any aeroplane, using said airport, and under the control and/or supervision of any of them, from using or invading the airspace over the area and properties first described by plaintiffs in this Bill of Complaint, at an altitude of less than five hundred feet (500') above the surface of the earth below or less than whatever altitude the Court may judicially find and determine is or may be necessary in order to protect plaintiffs against the commission of a nuisance by such aircraft in flight.

"2. That the Court order, adjudge and decree that Ordinance No. 981-A of the City of St. Petersburg, Florida, is unreasonable, arbitrary and discriminatory; that it denies unto plaintiffs the equal protection of the laws; that it deprives them of their property without due process of law and is violative of the Declaration of Rights of the Constitution of the State of Florida and the Fourteenth Amendment of the Constitution of the United States and that said ordinance be decreed by the Court to be absolutely null and void and of no force or effect and that defendants herein be perpetually enjoined from enforcing or attempting to enforce the same or any of the provisions thereof.

"3. That in the event plaintiffs are mistaken as to any relief herein prayed for that they be granted such other general or additional relief as the Court deems they are entitled to in equity and good conscience."—And

"That the Court adjudge and decree that Albert Whitted Airport in St. Petersburg, Florida, used as an airport by airplanes and/or the operators thereof, in taking off from and in landing upon said airport constitutes a nuisance and that the operation and continuation of said airport for such purposes be perpetually abated and enjoined."

"A perusal of the pleadings and the testimony brings us to the conclusion that the final decree clearly sets forth the pertinent facts disclosed by the record and enunciates the correct principles of law to be applied thereto.

"The decree is as follows:

"The bill of complaint sets forth various contentions of plaintiffs in support of their position that the defendants

should be enjoined from operating Albert Whitted Airport upon the theory of abatement of a nuisance. It is true that such relief is not the only relief requested by plaintiffs. However, such objective is the ultimate and only and sought for fulfillment of the alternative prayer, seeking an injunction against planes flying not less than five hundred feet above the property of plaintiffs' is impossible of attainment in taking off and landing at said airport.

"The only objections to the operation of the airport, which have impressed this Court, are to-wit: Excessive noise and fear of property damage, as well as personal safety created and engendered by unnecessarily low flying particularly in taking off from and in landing upon Albert Whitted Airport. All other complaints are deemed by this Court either to be untenable or unavailing to plaintiffs for several reasons.

"The establishment of Albert Whitted Airport in 1928 was not adventitious. Its creation was planned and publicized. Moreover the enlargement and improvement program was made known to the citizens of St. Petersburg, including plaintiffs, by newspaper articles and by the work itself as it progressed. The City of St. Petersburg and the Federal Government in the establishment, enlargement and improvement of the airport in question expended approximately One Million, Two Hundred Fifty Thousand Dollars of public funds without a voice being raised, in a legal sense, against the project until the institution of this suit. In connection with the matter of improvements, it is important to consider that the city council in May, 1944, entered into an agreement with the United States Government, looking to the further improvment and extension of Albert Whitted Airport, whereby the United States Government was to proceed with the development of the airport and expenditure of large sums of money therefor, upon the condition that the City would, among other things, continue to operate Albert Whitted Airport as a public airport throughout the life of the improvements so to be made, and pursuant to said agreement the Federal Government expended a sum in excess of $500,000.00 to complete its part of said agreement.

"Plaintiffs' counsel contends that his clients have not been

guilty of laches. Plaintiffs attempted to avoid laches by their own testimony to the effect that they were too patriotic to institute an action of this kind during the time that our country was embroiled in the devastating conflict of World War II, and that prior to the war the airport was not used extensively. This excuse was seriously considered by the Court at the time of taking testimony but when the file of this case was inspected and the Court observed that the instant suit was initiated on May 14, 1945, three months before cessation of hostilities with Japan, plaintiffs' contention became a mere brutum fulmen. Counsel for plaintiffs further contends that laches will not bar action against a continuing nuisance. He cites respectable authority in support of his position. It is somewhat difficult, at least for this Court, to draw a definite, clear line of differentiation between a continuing and a permanent nuisance nor is it considered essential in the determination of this case to do so. It is sufficient to observe that laches is applicable in this case as against the attempt to enjoin the operation of Albert Whitted Airport, except and unless it should become mandatory upon the Court, in order to protect the inalienable rights of the plaintiffs to life, liberty, pursuit of happiness and the free use and enjoyment of their property, to rule otherwise. The airport is not a nuisance per se. So long as the defendants operate the airport, in the usual, normal and customary manner for operation of airports of this character, it cannot be declared a nuisance and its operation cannot be enjoined by plaintiffs and others similarly situated. (Thrasher v. City of Atlanta 178 Ga. 514, 173 S.E. 817, 99 A.L.R. 158; Delta Air Corp., et al. v. Kersey 140 A.L.R. 1352; Batcheller v. Commonwealth 10 S.E. 2nd 525.) Regardless of laches the individual, although harrassed, annoyed and subjected to inconvenience, cannot stand in the way of progress but must yield to the summum bonum—the greatest good for the greatest number. (Smith v. New England Aircraft Company 270 Mass. 511, 69 A.L.R. 300.)

"The City of St. Petersburg established, has operated and is operating Albert Whitted Airport by virtue of legislative authority. (See National Container Corporation, et al. v.

State ex rel. Stockton 138 Fla. 32, 189 So. 4; Watson v. Holland 20 So. 2nd 388; City of Bessemer v. Abbott 103 So. 447; Chicago and Eastern Railroad Company v. Loeb 118 Ill. 203, 59 American Reports 341; Thrasher v. Atlanta, supra.) Such authorization though it recognizes the essentiality in this progressive era of municipal airports in order that Florida may keep pace with modernity and its attending innovations, is not a license to the City to ignore or run roughshod over the individual citizen in disregard of his constitutional rights. The City should be mindful at all times of the admonition which comes to us from the days of the Roman Empire, 'sic utere tuo ut alienum non laedas'—so use your own property as not to injure another's. That aviation is as much a part of modern civilization as is the railroad, steamship and automobile as a means of transportation of both freight and passengers is too obvious for serious discussion. The place which aviation now occupies was envisaged, probably initially, by Alfred Lord Tennyson in his prophetic dream which we find recorded in his frequently quoted poem, 'Locksley Hall,' when he wrote:

'For I dipt into the future, far as human eye could see,
Saw the vision of the world, and all the wonder that
    would be;
Saw the heavens fill with commerce, argosies of magic
    sails,
Pilots of the purple twilight, dropping down with costly
    bales.'

"Several modern jurists have depicted in able, cogent style the position which aviation has attained. The late, lamented Mr. Justice Cordoza, in his inimitable manner in the case of Hess v. Rath, 164 N. Eastern 342, in 1928, the year in which Albert Whitted Airport was established, wrote:

" 'We think the purpose to be served is both public and municipal. A city acts for the city purposes when it builds a dock or a bridge or a street or a subway. Its purpose is not different when it builds an airport. Aviation is today an established method of transportation. The future, even the near future, will make it still more general. The city that is

without the foresight to build the ports for the new traffic may soon be left behind in the race of competition. Chalcedon was called the city of the blind because its founders rejected the nobler site of Bysantium lying at their feet. The need for vision of the future in the governance of cities has not lessened with the years. The dweller within the gates, even more than the stranger from afar, will pay the price of blindness.'

"Again, in the case of Stengel v. Crandon, 23 Southern, Second, 835, Mr. Justice Thomas, in a masterful opinion on the subject of aviation's place in modern affairs, stated:

" 'In any metropolitan center in America the droning of airplane motors is almost constant, and obviously aircraft bearing passengers, mail and freight in and out of cities could not operate were their approaches and departures confined to territory uninhabitated and untraversed by roads and highways. In almost every town of any consequence in Florida for more than three years the sound of airplanes has been almost incessant as men trained in them for the very purpose of safeguarding the constitutional guaranties, including the one that a person may not be deprived of property without due process of law, by warding off the attacks of enemies advocating the ideologies which were the very antithesis of the American system of Government. These airplanes are not mere noisy nuisances, nor are they vehicles still in the experimental stage, but they represent the latest means of transportation, and certainly if we are to progress, the establishment of airports to accommodate them should be encouraged.'

"In the most recent advance sheet of the Southern Reporter, there appeared, from the gifted and colorful pen of Mr. Justice Terrell in the case of State of Florida v. County of Dade, 27 Southern, Second 283, the following appropriate observations:

" 'The act in question deals with airports and accessories, but this Court knows that air transportation is one of the great innovations of the age, that Miami is potentially one of the greatest air distributing points in the World, and that Florida is the port of entry for air transportation from South

and Central America, the West Indies, and Africa. It is quite true that there were no Jules Verns or Wright Brothers in the Constitutional Convention to portend the marvelous changes the future had in store, but it was not intended by those present that the dead hand of the past should shape the destiny of the future. Constitutional mandates are wise in proportion to the manner in which they respond to the public welfare and should be construed to effectuate that purpose when possible. The law does not look with favor on social or progressive stalemates. As we said in City of Coral Gables v. Crandon, supra, extension of political controls should keep pace with physical changes, and collective ingenuity should not be hobbled by the Constitution in a way to be outclassed by collective design to overreach and serve a selfish purpose.

"'. . . Chapter 29963 deals with instrumentalities that are far from local in their out-reach—they are statewide and international in their potentialities. It would be difficult to name an instrumentality that more vitally affects public transportation than the airport.'

"But we must inquire; has this airport been operated by the City in such manner as to invade the fundamental rights of these plaintiffs and those similarly situated? The answer to this question is the key to the proper determination of this case. On the whole the operation of Albert Whitted Airport has been carried on in the usual, normal and customary manner prescribed for the operation of municipal airports and recognized as appropriate. It is proper to consider, in connection with this subject, the rules and regulations which have been adopted by the City and which are supposed to govern the operation of the airport. These rules and regulations, inter alia, provide that no plane taking off from or landing upon the field shall be at a height less than 150 feet above any structure or at a height less than 100 feet when crossing the airport boundary.

"These provisions have been aproved by the Civil Aeronautics Authority and are deemed by the Court to be reasonable. Certainly they are not palpably unreasonable or arbitrary. It appears affirmatively from the evidence, however,

that these rules have been violated in many instances. Such violations form the primary, if not the only reasonable, basis for this suit. That these violations should, indeed must, cease is patent. But are these infractions by individual aviators chargeable to the City? We think there is and can be but one answer. If the City is not responsible for and properly chargeable with enforcement of the rules and regulations, who can be? To pose the query is to answer it—no one save and except the municipality. The City owes to every citizen the utmost care, caution and precaution in the operation of its utilities and in carrying on each of its municipal functions. Every safeguard possible should be thrown around the individual in the protection of his property and of his person. This is not to be taken as holding that the individual is relieved of all responsibility and may go blithely on his way heedless of normal danger, nor is it an invitation to inaugurate frivolous litigation. It is, however, a fundamentally sound observation and one of the paramount reasons for the ruling hereinafter made.

"The Court is constrained, in the exercise of its sound judicial discretion, to deny the relief sought by the plaintiffs but with directions to the defendant, City of St. Petersburg:

"1. To erect a control tower at as early a date as is possible under existing building conditions;

"2. To employ some person or persons to be on duty at all hours when Albert Whitted Airport is open for use by aviators as an air field;

"3. To place the duty and responsibility upon such person or persons to enforce the rules and regulations established for the proper operation of the said airport particularly the rules with regard to the heights below which a plane may not fly in taking off from and landing upon Albert Whitted Airport;

"4. To enforce the aforementioned rules and regulations without fear or favor and, if necessary, refuse future use of the airport to any violator.

"IT IS THEREUPON ORDERED, ADJUDGED AND DECREED that the relief sought by the plaintiffs in and by

their bill of complaint be and it is hereby denied, and the bill dismissed.

"IT IS FURTHER ORDERED, ADJUDGED AND DE-CREED that the City of St. Petersburg, be and it is hereby directed:

"1. To erect a control tower at as early a date as is possible under existing building conditions;

"2. To employ some person or persons to be, on duty at all hours when Albert Whitted Airport is open for use by aviators as an airfield;

"3. To place the duty and responsibility upon such person or persons to enforce the rules and regulations established for the proper operation of said airport particularly the rules with regard to the heights below which a plane may not fly in taking off from and landing upon Albert Whitted Airport;

"4. To enforce the aforementioned rules and regulations without fear or favor and, if necessary, refuse future use of the airport to any violator.

"IT IS FURTHER ORDERED, ADJUDGED AND DE-CREED that the costs of this litigation be borne equally between plaintiff and defendant.

"IT IS FURTHER ORDERED, ADJUDGED AND DE-CREED that jurisdiction of this cause be, and it is hereby retained for the sole purpose of enforcing this decree.'"

After careful review and thoughtful consideration, it appears to us that we can do no better than to adopt the decree of the Chancellor as expressing our views and judgment herein. Under this decree we must assume that the defendants will adopt rules and regulations governing the users of the airport which, among other things, will reasonably prohibit planes being flown over the property of plaintiffs at a height less than will be required to prevent the vibration caused by the operation of the plane, doing damage to the house or other property of either of the plaintiffs, and will also prohibit planes being flown over the property of plaintiffs at a height less than that which will reasonably eliminate shock and fright being reasonably experienced by persons occupying plaintiffs' property. Such rules and regulations should be based on a stated finding of fact and thereon fixing

the minimum reasonable height at which planes may be flown over the property of plaintiffs. Of course, all such findings, rules and regulations may be reviewed by the Court and approved, modified or vacated on application properly hereafter presented in this cause.

The decree is approved and affirmed.

THOMAS, C. J., CHAPMAN, J., and WILLIAMS, Associate Justice, concur.