Antonik et al., Appellees, *v.* Chamberlain et al.; Chamberlain Engineering Corp., Appellant. Antonik et al.; Ake et al., Appellants, *v.* Chamberlain et al., Appellees. Antonik et al.; Old Trail School, Appellant, *v.* Chamberlain et al.; Chamberlain Engineering Corp., Appellee.

(Nos. 3842, 3846 and 3847—Decided December 23, 1947.)

*Messrs. Buckingham, Doolittle & Burroughs* and *Messrs. Slabaugh, Guinther, Jeter & Pflueger,* for appellees Sam Antonik et al. and appellants Merline E. Ake et al.

Mr. *James E. Alpeter* and Messrs. *Brouse, Mc-Dowell, May, Bierce & Wortman,* for appellant and appellee Chamberlain Engineering Corporation.

Messrs. *Wise, Roetzel, Maxon, Kelly & Andress,* for appellant Old Trail School.

BY THE COURT. In these appeals on questions of law and fact, plaintiffs, who are the owners of, and reside in, their properties located west of Akron, Ohio, in the vicinity of property of defendants, and also Old Trail School, likewise in the vicinity of said property, seek an injunction to restrain defendants from using their premises as a class I, privately owned, airport, and from constructing or operating such airport thereon.

Of the three defendants, Chamberlain Engineering Corporation is the only one involved in this controversy; and hereinafter, where the word "defendant" is used, it shall refer to said corporation.

Defendant's premises are located approximately one-fourth mile west of the westerly corporation limits of the city of Akron, are unrestricted and unzoned, and consist of approximately 450 acres of vacant land.

It is defendant's intention to construct upon its premises a class I airport, from which will be flown airplanes of a rating of 190 and under, and also to erect thereon such buildings as may be necessarily incident to the operation of such airport.

The Common Pleas Court issued the injunction on behalf of thirteen of the plaintiffs, representing the ownership of seven of the various properties. Thereafter, all of the losing parties filed appeals in one or another of the three cases now before us.

Defendant's plans for the location of its runways, and for grading its premises, are shown by the evidence introduced in this court to be materially differ-

ent than were its plans of construction when this case was heard by the Common Pleas Court.

The present plan of defendant, as shown by the evidence, contemplates a relocation and lengthening of its runways, and the adoption of a mixed flight pattern in the operation of the airport, which it is claimed will almost, if not entirely, eliminate flying over the buildings of any of the parties plaintiff.

The basis of plaintiffs' claim for relief, as disclosed by the pleadings and briefs, is "that the operation of an airport upon defendants' property would of necessity create a nuisance to all of the plaintiffs, and would further result necessarily in repeated trespasses upon plaintiffs' properties by airplanes using defendants' property. * * * that by reason of the nuisance and trespasses the plaintiffs would be seriously interfered with in the peaceful enjoyment of their homes, and that the value of their properties would be substantially impaired, and they would suffer irreparable injury."

It is conceded that before the defendants had performed any substantial work upon their premises, a considerable number of plaintiffs notified defendants in writing of their objections to the location and operation of an airport upon the site in question.

To the petitions (original and intervening), the defendants have demurred, for the reasons:

First, that there is a misjoinder of parties plaintiff.

Second, that several causes of action are improperly joined in said petitions.

Third, that the petitions do not state facts which show a cause of action.

As to the first and second grounds of demurrer, we find that there is no misjoinder of parties plaintiff or of causes of action.

As to the third ground, the demurrer is overruled, because "ordinarily, a party is entitled to the preven-

tive remedy by injunction against a threatened wrong to his property rights, by one having the power to commit it, which, if consummated, would cause him irreparable injury, for which courts of law can afford no adequate redress. He need not wait until the injury is done, since, to require him to do so, would defeat the remedy. It is, however, well settled, that the party who seeks the remedy, must not only show some clear legal or equitable right, but also, a well grounded apprehension of immediate and substantial injury to such right." *Reemelin* v. *Mosby,* 47 Ohio St., 570, at pages 573-574, 26 N. E., 717. And, see, 55 A. L. R., 880, annotation, and cases there cited.

The petitions herein, in our opinion, contain allegations sufficient to constitute a cause of action for injunction.

To the petitions of the plaintiffs, defendants have filed answers, wherein, after certain admissions, general denials of the allegations of the petitions are made.

The federal statutes which must be considered herein are as follows:

"The United States of America is hereby declared to possess and exercise complete and exclusive national sovereignty in the air space above the United States, including the air space above all inland waters and the air space above those portions of the adjacent marginal high seas, bays, and lakes, over which by international law or treaty or convention the United States exercises national jurisdiction. * * *" Title 49, Section 176 (a), U. S. Code.

"As used in this subchapter, the term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority, and such navigable airspace shall be subject to a public right of freedom of interstate and foreign air navigation in conformity with the requirements of this subchapter." Title 49, Section 180, U. S. Code.

"There is hereby recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the navigable air space of the United States." Title 49, Section 403, U. S. Code.

The Civil Aeronautics Board regulations which must be considered herein are the following, which were effective as of October 8, 1947:

"60.00 Scope. The following air traffic rules shall apply to aircraft operated anywhere in the United States, including the several States, the District of Columbia, and the several Territories and possessions of the United States, including the Territorial waters and the overlying airspace thereof, except:

"(a) military aircraft of the United States armed forces when appropriate military authority determines that noncompliance with these rules is required and prior notice thereof is given to the Administrator, and

"(b) aircraft engaged in special flight operations, requiring deviation from these rules, which are conducted in accordance with the terms and conditions of a certificate of waiver issued by the Administrator."

"60.100 Application. Aircraft shall be operated at all times in compliance with the following General Flight Rules and also in compliance with either the Visual Flight Rules or the Instrument Flight Rules, whichever are applicable."

"60.107 Minimum safe altitudes. Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes:

"(a) Anywhere. An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface.

"(b) Over congested areas. Over the congested areas of cities, towns or settlements, or over an open-

air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft. Helicopters may be flown at less than the minimum prescribed herein if such operations are conducted without hazard to persons or property on the surface and in accordance with (a) above; however, the Administrator, in the interest of safety, may prescribe specific routes and altitudes for such operations, in which event, helicopters shall conform thereto;

"(c) Over other than congested areas. An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In such event, the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure. Helicopters may be flown at less than the minimums prescribed herein if such operations are conducted without hazard to persons or property on the surface and in accordance with (a) above * * *."

"60.108 Operation on and in the vicinity of an airport. Aircraft shall be operated on and in the vicinity of an airport in accordance with the following rules:

"(a) When approaching for landing, all turns shall be made to the left unless the airport displays standard visual markings approved by the Administrator and which indicate that all turns are to be made to the right, or unless otherwise authorized by air traffic control."

The pertinent Ohio statute (Section 6310-42, General Code), which refers to the Ohio Aviation Board, is as follows:

"It shall be the duty of the board to, and it shall, administer and enforce the provisions of this act [Sections 6310-38 to 6310-50b, General Code]. For such purpose the board is authorized and empowered, subject to and in accordance with the provisions of the

administrative procedure act, to adopt and promulgate such rules and regulations as it deems necessary to carry out and enforce the provisions of this act.

\* \* \* \* \*

"All rules, regulations and amendments thereto, prescribed by the board, shall conform to and coincide with, so far as possible, the provisions of the Civil Aeronautics Act of 1938, and acts amendatory thereto, passed by the Congress of the United States, and air commerce regulations issued pursuant thereto."

Under the above federal statutes, the determination of what shall constitute the "navigable airspace" above the earth is left to the Civil Aeronautics Authority (Section 180 of Title 49, U. S. Code, *supra*), and that body, by one of its regulations (paragraph 60.107, *supra*), has declared:

"Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes:

\* \* \* \* \*

"(b) Over congested areas \* \* \* 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft. \* \* \*

"(c) Over other than congested areas \* \* \* 500 feet above the surface, except over open water or sparsely populated areas." In the latter event, "the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure."

It is urged by the plaintiffs that the above limits preclude the flying of aircraft over the property of another at a height of less than 500 feet when taking off or landing, and the cases of *United States* v. *Causby*, 328 U. S., 256, 90 L. Ed., 1206, 66 S. Ct., 1062, and *Swetland* v. *Curtiss Airports Corp.* (Sixth C. C. A.), 55 F. (2d), 201, 83 A. L. R., 319, are cited as leading authority supporting that contention.

Plaintiffs concede that their respective properties are not in a "congested area," as that term is used in the regulations.

1. In our consideration of the implications of this case, we are first met with the maxim familiar to the profession: *"Cujus est solum, ejus est usque ad coelum et ad inferos"* (Whose is the land, his is also that which is above and below it). This maxim has been applied through the ages to a variety of circumstances, and many courts in this country and England, in considering a landowner's right in the airspace above, have given it the sanctity of an axiom or corollary in the field of mathematics.

We find that the maxim has not been generally applied in cases which establish rights in airspace occupied by aviators in the operation of aircraft. The federal government has, in fact, rejected the doctrine and has placed navigable airspace, as prescribed by the Civil Aeronautics Authority, in the public domain, and hence not subject to private ownership or control. *United States* v. *Causby, supra.*

By the provisions of Title 49, Section 176 (a), U. S. Code, it is provided:

"The United States of America is hereby declared to possess and exercise complete and exclusive national sovereignty in the air space above the United States * * *."

"Sovereignty" is defined as meaning "2. Supremacy in respect of power, domination, or rank; supreme dominion, authority, or rule." Oxford English Dictionary.

In flying below the "navigable airspace," does the aviator commit trespass while landing and taking off, if, in so doing, he flies over the lands of others?

The chief characteristic of ownership is the right to complete dominion, and when ownership is applied

to land it means the land itself and what pertains to it, and the right for the time being to possess and enjoy it.

The boundaries of a man's private domain cannot be crossed without permission. In law this permission is called a license. If the permission is lacking, the invasion of the property is a trespass, even though unaccompanied by damage. Lawful license to enter one's premises may be given either (1) impliedly by the owner; (2) expressly by the owner; (3) by law.

There is no unanimity of opinion among courts respecting the rights or the extent of ownership, if any, of the landowner in the superadjacent airspace above his land. Many formulae have been advanced, extending from the "ad coelum" doctrine above mentioned, to no ownership at all in airspace not then presently used. *Hinman* v. *Pacific Air Transport*, 84 F. (2d), 755.

Be that as it may, assuming that the pronouncement of the Supreme Court of the United States in *United States* v. *Causby, supra,* is and should be the law, that "The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land.* * * The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material," and that because of such ownership his boundaries may not be crossed at an altitude below 500 feet without permission, does not law give the aviator the right to cross the boundaries in the superadjacent airspace, when landing or taking off, and in so doing obviate what would otherwise be an act of trespass? What do the Civil Aeronautics Authority regulations mean when they provide: "Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes," etc., if they do not mean that an aviator is

given permission to use the airspace above another's land, in landing or taking off, at heights below those altitudes later specified to be minimum safe altitudes? The regulations would be difficult indeed to understand if they were construed to mean that by federal authority one may fly over another's land without trespass if operating in the "navigable airspace," whereas he becomes a trespasser when taking off or landing, if he flies over another's land at a lower height in reaching or leaving the "navigable airspace."

In order that effect may be given to the regulations permitting flight in the public domain, the words of the regulations—"Except when necessary for take-off or landing"—must be construed to mean that a right is given to fly over the lands of others at heights of less than 500 feet, when necessary for take-off or landing.

Inasmuch as the United States has declared itself to be possessed of complete and exclusive national sovereignty in all of the airspace above the United States, and inasmuch as "sovereignty" means "supreme dominion," the United States thereby has reserved to itself the right, "when necessary for take-off or landing," to grant to aviators licenses to reasonably use the airspace below the "navigable airspace."

We reject the theory of trespass under these circumstances, unless the acts of landing and taking off are done under such circumstances as to constitute an abuse of the license. This on the theory that, if the authority to cross the boundaries of one's property is conferred by law, abuse of that authority not only terminates the license, but revokes it. And by abuse is meant the kind of abuse considered in the *Causby case, supra,* which constituted the appropriation of property for public use in contravention of the Fifth Amendment of the Constitution of the United States, or, such abuse as would constitute a nuisance.

2. Has there been a sufficient showing of a threatened nuisance to warrant an order for injunctive relief?

Nuisance, in law, for the most part consists in so using one's property as to injure the land or some incorporeal right of one's neighbor. An act which is wrongful in itself may be adjudged wrongful before it is committed, as well as afterwards. But an act which is in itself rightful, and may become wrongful only because of some effect which it produces, is generally not proved wrongful by *a priori* reasoning. Even when it appears that a given act or acts done in a *certain way* are wrongful, it does not follow that some part of the act or acts may not be rightfully done, or even that the entire operation may not be later done in such a way as to be rightful. It is often found that the damage to the defendant which the interference of a court, through injunction, would cause, will be out of all proportion to the damage to the plaintiff or to the public in general.

The law of nuisance plys between two antithetical extremes: the principle that every person is entitled to use his property for any purpose that he sees fit, and the opposing principle that everyone is bound to use his property in such a manner as not to injure the property or rights of his neighbor. For generations, courts, in their tasks of judging, have ruled on these extremes according to the wisdom of the day, and many have recognized that the contemporary view of public policy shifts from generation to generation.

In our business of judging in this case, while sitting as a court of equity, we must not only weigh the conflict of interests between the airport owner and the nearby landowners, but we must further recognize the public policy of the generation in which we live. We

must recognize that the establishment of an airport of the kind contemplated is of great concern to the public, and if such an airport is abated, or its establishment prevented, the consequences will be not only a serious injury to the owner of the port property but may be a serious loss of a valuable asset to the entire community.

The necessities of a social state, especially in a great industrial community, compel the rule that no one has absolute freedom in the use of his property, because he must be restrained in his use by the existence of equal rights in his neighbor to the use of his property. This rule has sometimes been erroneously interpreted as a prohibition of all use of one's property which *annoys* or *disturbs* his neighbor in the enjoyment of his property. The question for decision is not simply whether the neighbor is annoyed or disturbed, but is whether there is an injury to a legal right of the neighbor. The law of private nuisance is a law of degree; it generally turns on the factual question whether the use to which the property is put is a reasonable use under the circumstances, and whether there is "an appreciable, substantial, tangible injury resulting in actual, material, physical discomfort, and not merely a tendency to injure. It must be real and not fanciful or imaginary, or such as results merely in a trifling annoyance, inconvenience, or discomfort." 39 American Jurisprudence, Nuisances, Section 30. And, see, *Eller* v. *Koehler,* 68 Ohio St., 51, 67 N. E., 89.

"It is not everything in the nature of a nuisance which is prohibited. There are many acts which the owner of land may lawfully do, although it brings annoyance, discomfort or injury to his neighbor, which are *damnum absque injuria.* * * *

"* * * The test of the permissible use of one's own land is not whether the use or the act causes injury to

his neighbor's property, or that the injury was the natural consequence, or that the act is in the nature of a nuisance, but the inquiry is, Was the act or use a reasonable exercise of the dominion which the owner of property has by virtue of his ownership over his property, having regard to all interests affected, his own and those of his neighbors, and having in view also public policy?" *Booth* v. *Rome, W. & O. Terminal Rd. Co.*, 140 N. Y., 267, 35 N. E., 592, 37 Am. St. Rep., 552, 24 L. R. A., 105.

All systems of jurisprudence recognize the requirement of compromises in the social state. Members of society must submit to annoyances consequent upon the reasonable use of property. *"Sic utere tuo ut alienum non laedas"* is an old maxim which has a broad application. If such rule were held to mean that one must never use his own property in such a way as to do any injury to his neighbor or his property, it could not be enforced in civilized society. People who live in organized communities must of necessity suffer some damage, inconvenience and annoyance from their neighbors. For these annoyances, inconveniences and damages, they are generally compensated by the advantages incident to living in a civilized state.

3. A brief summary of the contentions of the plaintiffs is that the defendants, if permitted to build and operate the airport, will inflict irreparable damage because of (1) noise, (2) dust, (3) attraction of crowds, who will trespass upon their premises, (4) annoyance in the peaceful enjoyment of their homes, (5) fright and fear of physical harm from low flying and the crashing of planes, (6) depreciation of property values.

The long record of testimony and exhibits is replete with evidence offered in support of and against these

claims. It is impossible, from this maze of evidence, to state with any degree of accuracy just what legal injury to the plaintiffs the evidence proves. To find that irreparable damage will follow from the operation of the port would be but guess and speculation. And to find that the use as an airport of approximately 450 acres of land beyond the city limits and away from the closely-built-up and congested part of the city is an unreasonable use of the land, would, we think, under the circumstances of this case, obstruct the development of aviation, as a legitimate and necessary industry, to an unreasonable extent.

Undoubtedly the plaintiffs will experience some discomfort, but that is one of the incidents or results of residing in a heavily-populated, highly-industrialized state. It is an incident of living in an age of progress, in which there are erected huge rubber factories, with their accompanying smells and noises; in which the streets and highways are used by great, noisy trucks for transportation; in which commercial airliners ply the skies continuously, for the speedy transport of persons and freight; and in which thousands of various industries throughout the cities and countryside contaminate and defile the former natural beauty, peacefulness and quiet of the vicinage.

Apropos of the claim of diminution in the value of plaintiffs' real property, because of the proposed construction and operation of the airport, it has been stated in *Hassinger* v. *Kramer,* 28 Ohio App., 449, at page 451, 162 N. E., 752, that: "It must be borne in mind that the remedy invoked here is that of injunction, which is summary, and out of the ordinary, and should never be granted save and except in cases for the prevention of great and irreparable injury or mischief. Before an injunction should be granted,

the injury must be so great as to be incapable of compensation in damages.'' See, also, 7 A. L. R., 762, and 26 A. L. R., 939.

If plaintiffs' claim contemplates a diminution in the value of plaintiffs' property, because of a lessening of the sale value thereof, due to the construction and operation of an airport, then such damages as may be proved, are capable of compensation in money, and furnish no basis for granting the extraordinary remedy of injunction. And in connection with this claim, in a case where an anticipatory injunction is sought, the damages resulting from the future construction and operation of the airport would be so speculative as to be incapable of definite ascertainment, because no one can know in what manner the airport will be operated, and hence what damage, if any, would result from its operation.

The case before us presents legal and equitable principles of far-reaching importance. Whatever we decide here has a bearing upon every airport in this state. On the part of the plaintiffs it is in most part a question of comfort. On the part of the defendants it is a question of the life or death of a legitimate and necessary business. The inconvenience to be experienced by the plaintiffs from the erection of the airport does not appear to be any greater than the inconvenience or damage resulting to the owners and occupiers of residential property in the vicinity of or adjacent to any airport erected in this state. *Powell* v. *Craig,* 113 Ohio St., 245, at page 249, 148 N. E., 607.

Upon the evidence here presented, we are unable to conclude that defendant's contemplated use of its property is an unreasonable use, or that, through the construction and operation of the airport in question, the plaintiffs will suffer irreparable injury, as al-

480

leged, or that they have shown by the required degree of proof such substantial damage and injury as calls for injunctive relief from this court.

The petitions of the plaintiffs are dismissed.

*Petitions dismissed.*

DOYLE, P. J., STEVENS and HUNSICKER, JJ., concur.